**EAST FLATBUSH ELECTION COMMITTEE, et al., Plaintiffs,**

v.

**Mario CUOMO, et al., Defendants.**

**No. 86 CV 1386.**

United States District Court, E.D. New York.

Aug. 13, 1986.

---

Agostinho Dias Reis, New York City, for plaintiffs.

Robert Abrams, Atty. Gen., State of N.Y. by Joel Graber, Asst. Atty. Gen., New York City, for New York State defendants.

Frederick A.O. Schwarz, Jr., Corp. Counsel, City of New York by Jonathan Pines, Asst. Corp. Counsel, New York City, for New York City defendants.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Charles E. Knapp, Asst. U.S. Atty., Brooklyn, N.Y., for Federal defendant.

Before ALTIMARI, Circuit Judge, and MISHLER and PLATT, District Judges.

## MEMORANDUM AND ORDER

PER CURIAM:

### THE NATURE OF THE CASE

The class action complaint in the case at bar alleges violations of § 5 and § 10 of the Voting Rights Act of 1965, codified as amended at 42 U.S.C. §§ 1973c and 1973h (the "Act"), the First, Fourteenth, Fifteenth and Twenty-fourth Amendments to the United States Constitution and the Civil Rights Act of 1871, codified at 42 U.S.C. § 1981, *et seq.* Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1973c and 1973h.

### A. *Background*

The complaint and an Order to Show Cause were filed in the Brooklyn Courthouse of the Eastern District of New York on April 29, 1986, and assigned by random selection to Judge Platt. Oral argument on plaintiffs' request for a temporary restraining order enjoining the May 6, 1986 community school board elections was heard on May 2, 1986. At that time Judge Platt refrained from ordering any immediate equitable relief, but issued a formal request to Chief Judge Wilfred Feinberg, pursuant to 42 U.S.C. §§ 1973c and 1973h(c) and 28 U.S.C. § 2284(b)(1), for the designation of a three-judge panel to hear plaintiffs' claims arising under the Voting Rights Act. Letter from Judge Platt to Chief Judge Feinberg (May 6, 1986). The panel was duly designated by Chief Judge Feinberg on May 9, 1986. Before the panel could convene to hear argument, the attorney for the plaintiffs, Mr. Dias Reis, wrote to Chief Judge Weinstein of the Eastern District and Chief Judge Wilfred Feinberg of the Second Circuit regarding the composition of the three-judge court and requested that certain judges be excluded "because of interest, consanguinity or other conflict with one or more of the parties hereto, or their co-conspirators, agents, attorneys, principals or associates." Letter from Agostinho Dias Reis, Esq., to Chief Judges Feinberg and Weinstein (May 25, 1986). According

to Mr. Dias Reis, only Judges Sifton, Nickerson and Weinstein in this district and Timbers, Oakes, Newman, Kaufman and Feinberg on the Court of Appeals "lacked real legal bases for either recusal or disqualification." *Id.* By memorandum dated May 28, 1986, Chief Judge Weinstein, lacking authority to act in a case pending before other judges, referred the motion for recusal to the panel designated by Chief Judge Feinberg.

At the oral argument held on June 16, 1986, plaintiffs' attorney and plaintiff *pro se* moved for the recusal of the assembled judges. After each member had responded to his concerns, however, Mr. Dias Reis stated that "[a]s regards to the composition of this panel and as regards section 5, I have absolutely no objection with it." Tr. at 21. Therefore, the panel proceeded to hear arguments on the merits of the Voting Rights Act claims.

Two weeks later, in a letter dated June 30, 1986, plaintiff Dias Reis, among other things,[1] renewed his motion to recuse Judges Altimari and Platt, and then made a "further formal application ... to the Statutory Three Judge Court for its recusal." Letter from Agostinho Dias Reis, Esq., to Judge Platt (June 30, 1986). As we explained to plaintiffs' attorney and plaintiff *pro se* at oral argument, and as he appeared to concede, we have been unable to find or perceive any meritorious ground for recusal, individually or collectively, of any member of this Court.

B. *The Voting Rights Act Claims*

Paragraphs 20–24 of the complaint address two aspects of the New York Board of Education elections conducted on May 6, 1986. First, plaintiffs claim that several polling places were switched and that such alterations constitute a "change" in practice or procedure relative to voting within the parameters of the Act. Consequently such changes could not be effected without first obtaining preclearance by the Attorney General or instituting an action in the District Court for the District of Columbia for a declaratory judgment that such change has neither the purpose nor effect of denying or abridging the right to vote on account of race or color.

The second change allegedly within the meaning of the Act was a reduction of time from six to three days for the filing of specifications of the grounds of objections to nominating petitions. Again, plaintiffs claim that this practice was never precleared by the Attorney General or validated in a declaratory judgment action.

Finally, the plaintiffs allege in rather vague fashion that various members of the State judiciary who imposed fines on Mr. Agostinho Dias Reis in effect violated § 10 of the Voting Rights Act, 42 U.S.C. § 1973h, by "[c]onditioning access to the Courts, including the Appellate Courts [and the ballot] upon the payment of substantial sums of money by either the litigants or their attorneys." Complt. at ¶ 35.

At the oral argument on June 16, 1986, Mr. Dias Reis, the plaintiffs' attorney, listed in addition to these changes 17 other alleged changes in violation of the Voting Rights Act. Because these claims were not incorporated in an amended complaint or briefed prior to the argument (*i.e.*, neither the Court nor defense counsel had notice thereof), the Court declines to address them at this time.[2]

---

1. Additionally, Mr. Dias Reis requested the granting of poor persons' status to plaintiffs' attorney and plaintiff *pro se* "and the class which he represents." Letter from Agostinho Dias Reis, Esq., to Judge Platt (June 30, 1986). Judge Platt has advised the members of this panel that by his signature to this opinion he is granting to plaintiff *pro se* the right to proceed *in forma pauperis,* but only on behalf of himself, not on behalf of the members of the alleged class, because no evidence has been offered to prove the specific status of any or all other named members of the class herein, either individually or collectively.

2. In his June 30th letter Mr. Dias Reis renewed his claim for some 20 "substantial changes in standard, practice or procedure," that were instituted without receiving the requisite governmental approval. As explained above, we decline to rule on plaintiff's belatedly advanced claims.

## DISCUSSION

The Voting Rights Act was promulgated to ensure that the guarantees of the Fifteenth Amendment would finally become a reality for all citizens. It reflects a firm congressional intent to rid the country of racial discrimination in voting. *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966) (case provides a detailed discussion of Act's historical development and constitutionality). Since its passage the Supreme Court has interpreted and applied its provisions broadly, declaring that the Act "was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race, [and that] [t]he legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Allen v. State Board of Elections*, 393 U.S. 544, 565–66, 89 S.Ct. 817, 831–32, 22 L.Ed.2d 1 (1969). At the heart of the Act lies a "complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *South Carolina v. Katzenbach*, 383 U.S. at 315, 86 S.Ct. at 812. Section 5 provides for "the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination." *Id.* at 315–16, 86 S.Ct. at 812. The section reads in relevant part:

Whenever a State or political subdivision [covered by § 4] ... shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.... Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

██ In any action under section 5, the role of a three-judge district court is a rather restricted one. The court may *not* determine whether a change has the purpose or effect of denying or abridging the right to vote on account of race or color. This task was expressly reserved by Congress for consideration by the District Court for the District of Columbia or the Attorney General. *United States v. Board of Supervisors*, 429 U.S. 642, 646, 97 S.Ct. 833, 835, 51 L.Ed.2d 106 (1977). Local district courts are "limited to the determination whether 'a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny.'" *Perkins v. Matthews*, 400 U.S. 379, 383, 91 S.Ct. 431, 434, 27 L.Ed.2d 476 (1971) (quoting *Allen v. State Board of Elections*, 393 U.S. at 561, 89 S.Ct. at 829); *see also Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975); *Bramwell v. Kings County Republican County Committee*, —— F.Supp. —— No. 84-2847 slip op. (E.D.

N.Y. May 2, 1986) (three-judge court) (per curiam).

In the instant case the defendants have chosen not to dispute that the changes in polling places and the change in the number of days for filing objections are covered by § 5. Rather, defendants argue that the changes were subjected to the required federal scrutiny or will receive sufficiently prompt scrutiny to satisfy the provisions of the Act.

### A. *The Change in Polling Places*

According to the City all polling site changes in Bronx and Kings Counties were precleared in advance of the May 6 elections. Aff. of Betty Dolen at ¶ 2; Decla. of Jonathan Pines at ¶ 7. Due to circumstances beyond the City Board of Elections' control some of the polling site changes in New York County were submitted to the Attorney General within too short a period of time to receive preclearance prior to the holding of elections, but preclearance was obtained shortly thereafter. Pines Decla. at ¶ 7.[3]

The Court was initially troubled by the seeming oxymoron of "retroactive preclearance." Nevertheless, a review of the case law convinces us that this is indeed possible. In *Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978), the Supreme Court reviewed a decision by a three-judge district court from the Middle District of Georgia. In that case, as in ours, the plaintiffs had sought declaratory and injunctive relief just a few days prior to a scheduled election. The three-judge court did not act on the request for relief until after the elections had been held. When the court did address the matter it concluded that the changes were subject to § 5 but denied affirmative relief, having evaluated the changes, and concluded that they were rather technical and without any apparent discriminatory purpose or effect. On direct appeal the Supreme Court determined that the defendants' undisputed obligation to submit the voting law change to a congressionally designated forum had not been discharged and directed that "the requirement of federal scrutiny imposed by § 5 should be satisfied by appellees without further delay." *Berry*, 438 U.S. at 192, 98 S.Ct. at 2694. The district court was, therefore, ordered to grant the defendants 30 days to apply to the Attorney General for approval of the change. The Court concluded, "[i]f approval is obtained, the matter will be at an end." *Id.* at 193, 98 S.Ct. at 2694; *see also N.A.A.C.P. v. Hampton County Election Comm'n*, 470 U.S. 166, 105 S.Ct. 1128, 1137–38, 84 L.Ed.2d 124 (1985) (where election occurred without preclearance of changes, the Court again directed that the district court should enter an order allowing the defendant 30 days in which to submit changes to the Attorney General for approval).

■ Extrapolating from the dictates of these cases, the Court concludes that retroactive federal approval satisfies the preclearance requirements of § 5. As all the polling site switches were eventually approved by the Department of Justice, with one exception—*see supra* n. 3—the Court

---

**3.** At the oral argument plaintiff Dias Reis asserted that the polling place in his own district, the 61st E.D., 66th A.D., had been eliminated entirely. Concerned by this allegation the Court requested a prompt inquiry and response from the City.

By letter dated June 20, 1986, the Court was informed that the auditorium of St. Elizabeth of Hungary Rectory at 211–215 East 83rd Street was unavailable for the particular day of the school board elections but would be available in other elections. Therefore, all affected voters were informed of the change in location to P.S. 190 at 311 East 82nd Street. The change was not precleared but has since been submitted to the Department of Justice for retroactive approval. Letter from Jonathan Pines, Esq., Assistant Corporation Counsel, to Judges Altimari, Mishler and Platt (June 20, 1986).

Moreover, in response to Mr. Dias Reis' charge that he had been denied access to a polling place, the City conducted a search of the Board of Elections' records which revealed that Mr. Dias Reis was not listed on any voter list in Kings or New York County nor did his name appear on the list of non-citizen parents who are also entitled to vote in community school board elections. *Id.*

concludes that these changes do not violate the prescription of § 5.[4]

### B. *Change in Number of Days for Submitting Specifications*

The City argued that insofar as this may be deemed a change,[5] it was submitted with a package of other material and obtained the Attorney General's implicit approval in 1983. At that time the City submitted various statutes, rules and regulations pertaining to the community school board elections to the Department of Justice with a calendar for the May 3, 1983 election. The calendar provided that specifications to nominating petitions had to be filed within three days after filing of general objections. By letter dated April 22, 1983 to the Corporation Counsel the Attorney General indicated that it would interpose no objections to the changes submitted.

■ Guidelines for submissions to the Attorney General are spelled out in 28 C.F.R. § 51.25 (1984). The regulations require that:

Each submission should contain the following information or documents to enable the Attorney General to make the required determination pursuant to Section 5 with respect to the submitted change affecting voting: ... (b) if the change affecting voting is not readily apparent on the face of the document

provided under paragraph (a) or is not embodied in a document, a clear statement of the change explaining the difference between the submitted change and the prior law or practice, or explanatory materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting.

Because such steps were not followed with respect to the calendar change in filing days, the Department of Justice has taken the position that this calendar change, which was not specifically highlighted in the 1983 submission, "has not been considered to have been presented for preclearance." Letter from Charles E. Knapp, Esq., Ass't U.S. Attorney, to Judge Platt (June 6, 1986). *See also Haith v. Martin*, 618 F.Supp. 410, 413 (E.D.N.C.1985) (acts in question not precleared by inclusion with later enactments of State General Assembly), *aff'd*, —— U.S. ——, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). In light of this information the City has resubmitted this change to the Department of Justice and the Court, in keeping with *Berry* and *Hampton County*, will defer further action until the Attorney General issues a response.[6]

### C. *The Poll Tax*

Plaintiffs claim that defendants Mollen and Yoswein, Justices of the New York

---

**4.** The Court will await the Department of Justice's verdict on the temporary change in polling location in the 61st E.D., 66th A.D. district since approval could very well obviate the need for further action.

**5.** Pursuant to Article 52–A of the New York Education Law enacted in 1970 to create community school boards, the election of members is to be governed "so far as applicable" by the State Election Law. Section 6–154 of the Election Law governs the filing of specifications to objections to nominating petitions for all State elections. It provides for a period of six days to file specifications from the date of filing the objection. Since the inception of community school boards, however, the New York City Board of Elections has enforced a three-day filing requirement for specifications of the grounds of objections. This obligation has been enforced uniformly over time. Arguably, therefore, there has been no change within the meaning of the Voting Rights Act.

**6.** In *Berry* the Court noted that if approval was obtained the matter would be at an end; if approval was not obtained then plaintiffs would be free to renew their request to the district court for a new election. In contrast, in *Hampton County*, where the district court had "erroneously concluded that the changes were outside the scope of § 5," the Supreme Court indicated that if the Attorney General failed to approve the changes the election results should automatically be set aside. In the event of approval the district court was charged with the task of determining "in the exercise of its equitable discretion whether the results of the election may stand." *Hampton County*, 105 S.Ct. at 1138 & n. 36. This Court having determined that the changes were within § 5 assumes that the *Berry* contingencies would, therefore, be applicable.

State Courts, Slavin, a Judge in the New York Civil Court, and Stern, a legal assistant in New York Supreme Court, violated 42 U.S.C. § 1973h by:

a) Conditioning access to the Courts, including the Appellate Courts upon the payment of substantial sums of money by either the litigants or their attorneys.

b) Conditioning access to the ballot on the prepayment of said poll tax substitute for access to the Courts.

c) Conditioning the right of either a citizen voter or a candidate agrieved [sic] to challenge another candidate's right of access to the ballot on the prepayment of said poll tax substitute for access to the Courts.

Complt. at ¶ 35.

■ In their memorandum of law and at oral argument, plaintiffs failed to offer either the cases in which this occurred or any specific instance in which these defendants acted to the plaintiffs' detriment. Nor did plaintiffs' attorney attempt to show how such fines, if any, imposed in the course of a State Court action could be construed as a "poll tax" within the meaning of § 1973h. Thus, without a more specific pleading this Court must concur with the position taken by the Attorney General of the State of New York that defendants Mollen, Yoswein, Slavin and Stern "are not proper parties on this pleading because plaintiffs utterly fail to allege anything specific in respect of their conduct." State's Mem. at 12–13.

## CONCLUSION

The Court has determined that the changes in polling places obtained the requisite pre-clearance, albeit retroactively in some cases. The one exception was plaintiff *pro se*'s own voting locale change, which has not yet been approved. However, both that change and the change in the number of days for filing specifications to objections to nominating petitions have been submitted to the Justice Department for "preclearance." We will, therefore, defer action until the Justice Department issues its decision, because approval would obviate the need for any further proceedings before this Court. If approval is not obtained, then plaintiffs will be free to renew their request to this Court for a new election. *Berry*, 438 U.S. at 193, 98 S.Ct. at 2694.

■ Having addressed plaintiffs' § 5 and § 10 claims, the business of the three-judge court is, at least temporarily, concluded. The case itself may not be, because although preclearance by the Attorney General satisfies § 5 it does not bar further action to enjoin enforcement of the rule changes. Such further action, however, is the province of a single-judge court because "once the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5." *Allen v. State Board of Elections*, 393 U.S. at 549–50, 89 S.Ct. at 823.

SO ORDERED.