Deborah A. **LUPER** and Rinna Merculieff, Plaintiffs,

**Wuerch for Mayor**, Plaintiff–Intervenor,

v.

**MUNICIPALITY OF ANCHORAGE** and Linda Heim, Clerk of the Municipality of Anchorage in her official capacity, Defendants,

Jeffrey A. Friedman, and Neighbors for Mark Begich, Defendants–Intervenors.

No. A03–0079.

United States District Court, D. Alaska.

June 20, 2003.

Kenneth P. Jacobus, Anchorage Alaska for Plaintiffs Deborah A. Luper and Rinna Merculieff.

Jeffrey A. Friedman, Friedman, Rubin and White, Anchorage, Alaska for Intervenor Jeffrey A. Friedman.

Louisiana Cutler, Preston Gates and Ellis, Anchorage, Alaska for the Municipality of Anchorage and Linda Heim.

Jeff Feldman, Feldman & Orlansky, Anchorage, Alaska for Intervenor Neighbors for Begich.

Steve McAlpine, Anchorage, Alaska for Intervenor Wuerch for Mayor.

Before: TALLMAN, Circuit Judge, VON DER HEYDT, Senior District Court Judge, and SINGLETON, District Court Judge.*

OPINION

TALLMAN, Circuit Judge.

On April 1, 2003, the voters of the Municipality of Anchorage, Alaska, ("City") approved Proposition 2. Proposition 2 changed the Anchorage Municipal Charter so that candidates for Mayor need only obtain more than 45%, as opposed to more than 50%, of the popular vote to win, thereby avoiding a run-off election. Proposition 2 also stated that if passed by the voters, it applied to the results of the April 1 election. Proposition 2 passed with 54.99% of the vote. Unfortunately, the City did not first obtain approval, called "preclearance," from the Attorney General of the United States under the federal Voting Rights Act, 42 U.S.C. § 1973c, before submitting Proposition 2 to the voters and declaring it enacted into law. The candidate for Mayor who received the most votes earned 45.03% of the vote.

Litigation ensued.[1] The City sought approval after the fact and the Attorney General has now precleared Proposition 2. We are therefore left to decide what remedy, if any, to impose under these circumstances where an election is held without preclearance but preclearance is subsequently obtained. We conclude that no remedy is warranted, and we therefore dismiss the case.

I

Submitted to the voters on April 1, 2003, Proposition 2 reads in pertinent part:

* Judges Tallman and von der Heydt sitting by designation by the Chief Judge of the United States Court of Appeals for the Ninth Circuit in conformity with 28 U.S.C. § 2284.

1. Originally, Plaintiffs in this case challenged both the mayoral election and the election for the City's School Board. The winning candidate for the School Board, intervenor Jeffrey Friedman, however, has since been sworn into office. At oral argument, counsel for Plaintiffs urged that despite the alleged violation there was no need to impose a remedy ordering a run-off as to the School Board election. The results of that election therefore stand. Thus, our opinion will focus only upon the alleged Voting Rights Act violation regarding the mayoral election.

Shall section 11.02(b) of the Anchorage Municipal Charter be repealed and reenacted to read as follows:

(b) If no candidate for the office of Mayor receives more than forty-five percent (45%) of the votes cast for the office of Mayor, the Assembly within three (3) weeks from the date of certification of the election, shall hold a run off election between the two (2) candidates receiving the highest number of votes for the office. Run off elections under this section are not required, however, in races where the names of no more than two (2) candidates appeared on the initial ballot unless a write-in candidate received more votes than a candidate whose name is on the ballot. . . .

. . . .

If approved by the voters on the April 1, 2003 Regular Election, this proposition will be effective for this election.

In a field of eleven mayoral candidates listed on the April 1 ballot, candidate Mark Begich received 45.03% of the vote. The incumbent mayor, George Wuerch, was the next highest vote-getter, but his total was 37.17%. Begich is scheduled to be sworn in as the new mayor of Anchorage on July 1, 2003.

On April 10, 2003, Deborah Luper, a citizen of Anchorage, filed her original complaint in the United States District Court for the District of Alaska. The next day, on April 11, 2003, the City submitted Proposition 2 to the Attorney General for his approval. *See* 28 C.F.R. § 51.34.

Luper, along with fellow Anchorage citizen Rinna Merculieff (collectively "Plaintiffs"), filed their first amended complaint on April 14, 2003. The amended complaint named as defendants the City and Linda Heim, in her official capacity as the Clerk of the City (collectively "Defendants"). The complaint presented three causes of action. First, Plaintiffs alleged that Proposition 2 violated § 5 of the Voting Rights Act. Second, Plaintiffs alleged that Proposition 2 violated various portions of the Anchorage Municipal Charter. Third, Plaintiffs alleged that applying Proposition 2 to the April 1 election violated due process.

A related action was also filed in the Superior Court of Alaska, captioned *DeNardo v. State of Alaska*, No. 3AN–03–6518 CI. The parties in the Superior Court action are litigating various state election law issues pertaining to the April 1 election. Plaintiffs have now dismissed their second and third causes of action from the federal suit to pursue them in state court.

The federal complaint seeks both declaratory and injunctive relief. Specifically, Plaintiffs request that we enjoin the effectiveness of Proposition 2 as it would apply to the results of the April 1 mayoral election. Granting an injunction would trigger the need for a special run-off election pursuant to the Anchorage Municipal Charter.

Invoking 42 U.S.C. § 1973c and 28 U.S.C. § 2284(b)(1), Defendants requested that the district court convene a three-judge panel. Following 28 U.S.C. § 2284(b)(1), the district court notified the Chief Judge of the Ninth Circuit Court of Appeals, who appointed the members of this three-judge district court.

We then issued an order denying Plaintiffs' motion for a preliminary injunction. We thought that while Proposition 2 arguably fell under the gambit of changes in election laws that might require Attorney General preclearance, it was likely that the Attorney General would preclear Proposition 2 before the new mayor was sworn into office. We decided that we "should wait and see what action, if any, the Attorney General takes and only then schedule a hearing to determine an appropriate remedy for the failure to seek and obtain preclearance before the election was held."

On May 15, 2003, Joseph Rich, the Chief of the Voting Section of the United States Department of Justice, responded to the City's belated submission of Proposition 2 for approval. Rich notified the City that the Attorney General did not object to Proposition 2. *See* 28 C.F.R. § 51.41(a). Plaintiffs have raised objections to this decision to which—as of the date of this opinion—the Attorney General has not yet responded. On June 9, 2003, we held a hearing to determine what remedy, if any, this Court should impose if we assumed that the Attorney General would not reverse his prior decision interposing no objection to Proposition 2.

## II

### A

Section 5 of the Voting Rights Act reads in part:

Whenever a State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect [on various dates between 1964 and 1972], such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. . . . In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of the submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section.

42 U.S.C. § 1973c.

No party disputes that by failing to obtain preclearance for Proposition 2, the City violated § 5 of the Voting Rights Act. Nor does any party dispute that the failure to obtain preclearance was simply just an oversight by City officials. The thrust of Plaintiffs' First Amended Complaint is that Proposition 2 violated the Voting Rights Act by its failure to have been precleared. That alleged defect has now been addressed by the Attorney General. As of June 14, 60 days have run since the City submitted Proposition 2 for preclearance, and 30 days have passed since the Attorney General announced his decision not to object.

### B

Because the Attorney General has made no objection during the applicable 60–day period, we are left to decide whether we must order a remedy for the City's failure to obtain preclearance.

But we are not without guidance. In *Perkins v. Matthews*, 400 U.S. 379, 396–97,

91 S.Ct. 431, 27 L.Ed.2d 476 (1971), the Supreme Court noted that when a three-judge district court is considering an appropriate remedy for a Voting Rights Act violation, "it might be appropriate to enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so or if the required federal approval is not forthcoming." That is the course we followed here, but *Perkins* provides no further guidance regarding whether any additional remedy may still be appropriate once preclearance is obtained.

*Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978), however, does help explain the question left open by *Perkins*. In *Berry*, a three-judge district court refused to set aside an election conducted under a scheme that violated § 5, noting that there was an " 'apparent lack of any discriminatory purpose or effect' " in the state's employment of the scheme. 438 U.S. at 191, 98 S.Ct. 2692. On appeal, and citing the passage quoted above from *Perkins*, the Supreme Court allowed the state 30 days to apply for approval. The Court instructed that "[i]f approval is obtained, the matter will be at an end." *Berry*, 438 U.S. at 193, 98 S.Ct. 2692.

*NAACP v. Hampton County Election Commission*, 470 U.S. 166, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985), slightly qualified this edict from *Berry*. In *NAACP*, the Supreme Court again condoned the practice of allowing a state or political subdivision to submit the challenged act to the Attorney General for preclearance after the fact. 470 U.S. at 182, 105 S.Ct. 1128. The Court noted, however, that even if the Attorney General does not object to the change, the district court should still "determine, in the exercise of its equitable discretion, whether the results of the election may stand." *Id.* at 183, 105 S.Ct. 1128. Specifically, "[t]he factors to be weighed include the nature of the changes

complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5." *Id.* at 183 n. 36, 105 S.Ct. 1128 (citation and internal quotation marks omitted).

Exercising our equitable discretion, we do not think any further remedy is appropriate in the case before us. Proposition 2 does not smack of an invidious regulation aimed at violating minority voting rights. Instead, it merely lowers the percentage of votes needed to win an election, which arguably enhances minority voting rights. The failure to obtain preclearance was, by all accounts, an oversight. We also think it significant that Plaintiffs did not notify the City of its failure to obtain preclearance until *after* the election was held and the incumbent mayor lost. Now, approval has been obtained. We find, therefore, that even if there was a technical violation, the matter is now at an end. The results of the April 1, 2003, mayoral election shall stand. This conclusion is consistent with the limited purposes of a three-judge district court in a Voting Rights Act case. *See Lopez v. Monterey County*, 519 U.S. 9, 24, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996) ("The goal of a three-judge district court facing a § 5 challenge must be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible.").

Accordingly, Plaintiffs' First Amended Complaint is DISMISSED WITH PREJUDICE. The clerk shall enter a judgment and order consistent with this opinion.