I. Beverly LAKE, Jr., John Thomas Edlen, and Pieter Witteveen, on behalf of themselves and others similarly situated, Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF NORTH CAROLINA; M.H. Hood Ellis, in his capacity as Chairman of said State Board; William A. Marsh, in his capacity as Member of said State Board; Ruth Turner, in her capacity as Member of said State Board; Gregg O. Allen, in his capacity as Member of said State Board; June K. Youngblood, in her capacity as Member of said State Board; Alex K. Brock, in his capacity as Executive Secretary–Director of said State Board; James G. Martin, in his official capacity as Governor of the State of North Carolina; and Rufus Edmisten, in his capacity as Secretary of State for the State of North Carolina; and The Board of Elections of Durham County, North Carolina; Jo Overman, in her capacity as Chairman of said County Board; Ronald Gregory, in his capacity as Member of said County Board; and Edward Pope, in his capacity as Member of said County Board; and The Board of Elections of Guilford County, North Carolina; Betty J. Pearce, in her capacity as Chairman of said County Board; James S. Pfaff, in his capacity as Member of said County Board; and Robert W. Newsom, III, in his capacity as Member of said County Board, Defendants.

Civ. No. 2:91CV00254.

United States District Court,
M.D. North Carolina,
Greensboro Division.

March 31, 1992.

Robert Neal Hunter, Jr., Marshall Hurley, Patton, Boggs & Blow, Greensboro, N.C., I. Beverly Lake, Sr. (Retired Justice, N.C. Supreme Court), Wake Forest, N.C., for plaintiffs.

James M. Wallace, Jr., Edwin M. Speas, Jr., Charles M. Hensey, Tiare B. Smiley, N.C. Dept. of Justice, Atty. General's Office, Raleigh, N.C., for defendants.

Before PHILLIPS, Circuit Judge, BULLOCK, District Judge, and TILLEY, District Judge.

## MEMORANDUM OPINION

### PER CURIAM:

Plaintiffs have brought this suit alleging violations of § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1988), of the Due Process and Equal Protection Clauses of the Fourteenth Amendment actionable under 42 U.S.C. § 1983, and of state laws governing the electoral process. The action arises out of alleged irregularities surrounding the conduct of the November 6, 1990, general election in Durham and Guilford Counties, North Carolina, and the remedial efforts of state judges in those counties. Plaintiffs are I. Beverly Lake, Jr., the Republican candidate for the position of Associate Justice of the North Carolina Supreme Court, and two voters, one each from Durham and Guilford Counties. Defendants are the State Board of Elections of North Carolina, the Boards of Elections of Durham and Guilford Counties, the members of each of the three Boards in their official capacities, and the Governor and Secretary of State of North Carolina. Plaintiffs have pursued their claims through the administrative process, culminating with a decision by the State Board of Elections which did not provide the relief sought.[1] Plaintiffs seek to enjoin Defen-

---

1. After a recount, incumbent John Webb had a 15,405 vote margin in Durham County and a 2,641 vote margin in Guilford County. In the remaining ninety-eight counties Lake had a margin of 16,169 votes over Webb. The State Board concluded by a vote of 3–2 that irregularities in Durham County could have affected the state-wide results and that a new election should be held in that county. The Board voted unanimously that the irregularities in Guilford County could not have affected the state-wide results and that the results in that county be certified. The Board then voted 3–2 to certify the results as counted in all 100 counties. Under North

dants from certifying the results of the election for Associate Justice of the North Carolina Supreme Court, a declaration that the November 6 election is void, and an order requiring a new election. Defendants have filed motions to dismiss and for partial summary judgment; Plaintiffs have also moved for partial summary judgment.

## I.

The November 6, 1990, election in North Carolina included a contest for one of the state's seats in the United States Senate. The high profile nature of that contest, coupled with other congressional, statewide, and local races, resulted in a high voter turnout and associated problems. Among the other races was the race for Associate Justice of the North Carolina Supreme Court between John Webb and I. Beverly Lake, Jr., which is the subject of this litigation. The parties do not disagree that the facts are as found by the county and state Boards of Elections.

■■■ This court was convened under 42 U.S.C. § 1973c and 28 U.S.C. § 2284. Once convened, a three-judge court has pendent jurisdiction over and may dispose of all claims that are substantially related to the claim that required convening of the three-judge court. *United States v. Georgia Pub. Serv. Comm'n*, 371 U.S. 285, 287–88, 83 S.Ct. 397, 398–99, 9 L.Ed.2d 317 (1963); *Weintraub v. Hanrahan*, 435 F.2d 461, 463 (7th Cir.1970); *see also Clayton v. North Carolina State Bd. of Elections*, 317 F.Supp. 915, 919–20 (E.D.N.C.1970). Plaintiffs' § 1983 and state election law claims come under our pendent jurisdiction as substantially related claims and will be considered by the three-judge court on that basis.

## A.

Early on election day, voting machines in Durham County began experiencing problems and breaking down in some precincts, resulting in lines requiring a wait of over two hours to vote. The long lines were caused by the high voter turnout, an inade-

quate number of voting machines, malfunctioning of some machines, and the length and complexity of the ballot. Malfunctioning machines were taken out of service, exacerbating the problems associated with an already inadequate number of machines at each precinct. As a result of the problems, the Durham County Board of Elections met at approximately 1:00 p.m. and voted to extend voting hours from 7:30 p.m. to 8:30 p.m. as allowed by North Carolina General Statute § 163–2 (1987). Thereafter, some time after 2:30 p.m., counsel for the county Democratic Party presented approximately thirty affidavits and a motion to extend the voting hours until 10:00 p.m. and to authorize the use of paper ballots to a superior court judge at the Durham County Courthouse. The judge granted the motion.

Conditions at the precincts did not improve significantly, and the court order created additional problems. Precincts began to use the paper ballots for all voters even though they were statutorily authorized only for curbside balloting by those unable to enter the voting area. N.C.Gen.Stat. § 163–162 (1987). As a result, there was an insufficient number of curbside ballots for the elderly and handicapped. Additionally, in one precinct, photocopied paper ballots were used. These ballots were administered by volunteers under protest by precinct officials and were collected both in the official ballot box and in an unsecured trash bag. Election officials at precincts also made errors. State law requires officials to compile a list of voters who are in line at the time set by statute for closing the polls. N.C.Gen.Stat. § 163–168 (1987). Only those persons are allowed to vote after the polls close. As many as 1,998 persons allegedly entered the line to vote after 8:30 p.m. and were allowed to vote. The Durham County Board of Elections concluded that there was substantial evidence to believe that the irregularities which occurred might have affected the outcome of the election, and recommended

Carolina General Statute § 163–22.1 four members of the five-member State Board must vote for a new election before one can be held.

Therefore, the Board's 3–2 conclusion concerning Durham County did not result in a new election in that county.

to the State Board of Elections that a new election be conducted in Durham County for the office of Associate Justice of the North Carolina Supreme Court.

### B.

In Guilford County, at approximately 10:30 a.m., the chairperson of the county Democratic Party filed a request with the Board of Elections that the polls remain open past the statutory closing time of 7:30 p.m. because of voting machine malfunctions, an inadequate number of registration books, and high voter turnout. A second request was filed at approximately 3:00 p.m. After an independent investigation, the county Board of Elections met at 5:00 p.m. to consider the request. A motion was made to extend the voting time to 8:30 p.m. pursuant to North Carolina General Statute § 163–2, but failed for lack of a second.

Following the Board's failure to extend voting hours, representatives of the county Democratic Party presented affidavits and a complaint and motion to a superior court judge to extend the voting hours to 8:30 p.m. At 7:20 p.m., ten minutes before the polls were to close, the judge entered an order requiring the polls to remain open until 8:30 p.m. Due to the lateness of the order, not all polls were notified in time, and some closed at 7:30 p.m. Some persons who tried to vote at precincts after 7:30 were not allowed to do so. Some were able to vote at open precincts between 7:30 and 8:30 p.m.; however, the number of persons actually voting after 7:30 p.m. is not clear because election officials did not make a list of voters who voted after the normal 7:30 p.m. closing. The Guilford County Board of Elections determined that the irregularities and violations of election law were sufficiently serious and pervasive to cast doubt on the correctness of the results and recommended to the State Board of Elections that a new election be held in Guilford County for the office of Associate Justice of the North Carolina Supreme Court.

### II.

Plaintiffs complain of the irregularities in both counties. In Durham County, they allege specifically: (1) failure of the Durham County Board of Elections to provide voting machines in working order in twenty-four precincts and in the precinct transfer station; (2) failure of the Durham County Board of Elections to prepare and maintain properly the voting machines in twenty-four precincts and in the precinct transfer station; (3) failure of the Durham County Board of Elections to prevent extremely long lines in numerous precincts, thereby preventing voters from voting after a reasonable wait; (4) failure of the Durham County Board of Elections to distribute voting machines among the voting places as required by North Carolina General Statute § 163–161; (5) failure of the Durham County Board of Elections to provide proper curbside and paper ballots and ballot boxes with adequate security in numbers sufficient to accommodate voters in precincts with voting machine failures; (6) failure of the Durham County Board of Elections to distribute and collect paper ballots in the manner prescribed by North Carolina General Statute § 163–171; (7) failure of the Durham County Board of Elections to prevent individuals from voting after 8:30 p.m. in violation of North Carolina General Statute § 163–2 or to record the names and number of voters who voted after 8:30 p.m. as required by North Carolina General Statute § 163–168; (8) the invalidity of the order of the superior court judge directing that Durham County polls remain open until 10:00 p.m. when North Carolina General Statute § 163–2 vests authority with the county Board of Elections to extend polling hours and then only to 8:30 p.m., and allowing the use of paper ballots.

In Guilford County, Plaintiffs allege specifically: (1) failure of the Guilford County Board of Elections to provide voting machines in working order in six precincts; (2) failure of the Guilford County Board of Elections to provide proper duplicate registration books in seven precincts; (3) failure of the Guilford County Board of Elections to prevent extremely long lines in three

1204

precincts, thereby preventing voters from voting after a reasonable wait; (4) failure of the Guilford County Board of Elections to record the names and number of voters who voted after 7:30 p.m. as required by North Carolina General Statute § 163–168; (5) the invalidity of the order of the superior court judge directing that Guilford County polls remain open until 8:30 p.m. when North Carolina General Statute § 163–2 vests authority with the Guilford County Board of Elections to extend polling hours.

Plaintiffs allege violations of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1988), in that both judges ordered the polls to remain open in their counties beyond the statutorily prescribed closing time, which constituted changes that were not precleared under the Voting Rights Act. Plaintiffs also allege under 42 U.S.C. § 1983 that the irregularities in Durham and Guilford Counties constituted state action that deprived them of constitutional rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Finally, Plaintiffs request that this court review the State Board of Elections decision in lieu of the review provided in the Superior Court of Wake County by North Carolina General Statute § 163–181.

### III.

■ Plaintiffs allege that § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1988),[2] was violated because the orders of the superior court judges were "changes" under § 5 which were not precleared by the United States Attorney General. A state or political subdivision must be a covered

jurisdiction under the Voting Rights Act for the preclearance requirements of § 5 to apply. Defendants dispute the alleged coverage of the order entered in Durham County because it is not a covered jurisdiction. Defendants also dispute the necessity of preclearing the order in Guilford County, which is a covered jurisdiction. *See* 28 C.F.R. pt. 51 App. (1990).

■ It is undisputed that Durham County is not one of the forty counties in North Carolina covered by the Voting Rights Act. However, Plaintiffs contend that because the change in Durham County affects a statewide election it must be precleared. According to Plaintiffs, a law that is effective statewide requires preclearance due to its impact on the forty covered counties, and thus a change in Durham County that could affect the ultimate result of balloting in those covered counties must also be precleared. We find this argument unpersuasive and will dismiss the claim as it relates to Durham County.

If Plaintiffs' theory is adopted it would eliminate the significance of limiting the Voting Rights Act to covered jurisdictions. In several states, including North Carolina, only specific counties or towns are covered. Under Plaintiffs' theory, in any state with at least one covered jurisdiction any alteration in voting procedures in non-covered portions of the state would have to be precleared because the change could affect a statewide election and thus the covered jurisdiction. Such an extension is not supported by the language of the statute. Preclearance is required only for changes in covered jurisdictions, and Durham County is not covered. Therefore, the order of

**2.** Section 5 states, in relevant part:

Whenever a State or political subdivision [that is covered] ... shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging

the right to vote on account of race or color, ... and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted ... to the Attorney General and the Attorney General has not interposed an objection.... 42 U.S.C. § 1973c (1988).

the Superior Court of Durham County was not required to be precleared.

 Guilford County is a covered jurisdiction under the Voting Rights Act and subject to preclearance of changes under § 5. Therefore, we must consider the question of preclearance of the order of the Superior Court of Guilford County to extend voting hours from 7:30 p.m. to 8:30 p.m.

In a case involving § 5 of the Voting Rights Act, the inquiry of a three-judge district court is limited to whether " 'a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny' " of preclearance. *Perkins v. Matthews*, 400 U.S. 379, 383, 91 S.Ct. 431, 434, 27 L.Ed.2d 476 (1971) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 561, 89 S.Ct. 817, 829, 22 L.Ed.2d 1 (1969)). Section 5 is to be given a "broad scope" in that any alteration, regardless of how minor, is subject to scrutiny. *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 176, 105 S.Ct. 1128, 1134, 84 L.Ed.2d 124 (1985). *See* 28 C.F.R. § 51.12 (1990) (minor or indirect changes are covered). In determining § 5 issues, a court must consider: (1) whether there was an enactment or administration, *Allen*, 393 U.S. at 566, 89 S.Ct. at 832; (2) of a "voting qualification or prerequisite to voting or standard, practice or procedure with respect to voting" that is different from pre–1964 or the most recently precleared law, *Perkins*, 400 U.S. at 384, 91 S.Ct. at 435 (quoting oral opinion of district judge in same case); 42 U.S.C. § 1973c; and (3) "whether the challenged alteration has the *potential* for discrimination." [3] *Hampton County*, 470 U.S. at 181, 105 S.Ct. at 1137 (citing *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 42, 99 S.Ct. 368, 374, 58 L.Ed.2d 269 (1978); *Georgia v. United States*, 411 U.S. 526, 534, 93 S.Ct. 1702, 1707, 36 L.Ed.2d 472 (1973)).

**A.**

Plaintiffs must show that the Guilford County Superior Court order was a change from the existing law or from the procedures in effect at the time. This the Plaintiffs cannot do. The order effected no change, but merely mirrored a previously precleared statute, doing no more than North Carolina General Statute § 163–2 allows the county boards to do. [4] It extended the hours for the same length of time allowed by statute and imposed no additional restrictions. *See Woods v. Hamilton*, 473 F.Supp. 641 (D.S.C.1979) (ordinances merely implementing precleared statute not a change within the Voting Rights Act); *Webber v. White*, 422 F.Supp. 416 (N.D.Tex.1976) (Texas Supreme Court's order enforcing a previously precleared statute was no change).

 When the Attorney General reviews a new procedure or practice to determine if it would have the effect of impairing the right to vote, he compares it with the practice or procedure in effect at the time of the submission. *See* 28 C.F.R. § 51.54(b) (1990). Because North Carolina General Statute § 163–2 was validly in effect on November 6, 1990, the court order, if submitted, would be compared with a statute identical in substance and content. There would be no change from the previous law. It is irrelevant that it was a judge who ordered the polls to stay open because there was no difference in the qualifications, standards or procedures from those already in effect. It is the content of the change and not the form which determines whether or not it is within the scope of § 5. *See Hampton County*, 470 U.S. at 178, 105 S.Ct. at 1135.

**3.** We recognize that § 5 by its terms is not limited to changes that have a potential for discrimination. *See Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 49–50, 99 S.Ct. 368, 377–378, 58 L.Ed.2d 269 (1978) (Powell, J., dissenting). We perceive this inquiry to be one usually made by a court once it has determined that there has been a change or alteration, thus avoiding unwarranted submissions. Obviously

an alteration that has no *potential* for discrimination could not be found by the Attorney General or District Court of the District of Columbia to have a discriminatory purpose or effect.

**4.** This statute was precleared under § 5 in 1971 and again in 1973 when other provisions of the election laws were rewritten.

### B.

▮▮ Defendants contend that because the state court's order was remedial in nature and was entered in response to the exigent circumstances surrounding the election it falls within the court-order exception initially recognized by the Supreme Court in *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), and codified at 28 C.F.R. § 51.18 (1990). While the exception had its genesis in federal court-fashioned reapportionment plans, it has been considered in other circumstances. *See Hathorn v. Lovorn*, 457 U.S. 255, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982) (state supreme court ordered officials to enforce a statute which had been judicially altered). We believe the exception is equally applicable here.

As the legislative history of the 1975 extension of the Voting Rights Act points out, there is an exception to § 5 review when a court acts in response to exigent circumstances. *See McDaniel v. Sanchez*, 452 U.S. 130, 148–49, 101 S.Ct. 2224, 2235–36, 68 L.Ed.2d 724 (1981) (quoting S.Rep. No. 295, 94th Cong., 1st Sess. 19 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 785).

This is not a case in which a covered jurisdiction sought to administer a new voting practice. The difficulties surrounding the election in Guilford County created an emergency when qualified voters were unable to vote or delayed for unacceptably long periods of time. The court merely invoked its equitable powers to order remedial measures designed to alleviate the problems.

### C.

▮▮ Even if the court order constituted a change and was not otherwise exempt from § 5 review, it had no potential for discrimination on the basis of race or color. Extending the voting hours was a neutral action. All voters regardless of race had an equal opportunity to vote until 8:30 p.m. The extension did not hinder black voters, *see Hampton County*, 470 U.S. at 177, 105 S.Ct. at 1134; did not intimidate black voters, *see Perkins*, 400 U.S. at 388, 91 S.Ct. at 436; and did not dilute the votes of black

voters. *See Hawthorne v. Baker*, 750 F.Supp. 1090 (M.D.Ala.1990) (citing *Perkins*, 400 U.S. at 379, 91 S.Ct. at 431). If anything, the extension of voting hours had the potential to enhance the right to vote, allowing persons of all races to vote who otherwise may have been unable to do so. As noted, the substance of the order has already been precleared. In preclearing a change, the United States Attorney General determines whether the change has "the purpose ... [or] the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c; *see* 28 C.F.R. § 51.52. When North Carolina General Statute § 163–2 was precleared, the Attorney General determined that extending polling hours from 7:30 p.m. to 8:30 p.m. upon the vote of a partisan body had no purpose or effect of impairing the right to vote on account of race. Likewise, an extension of voting hours from 7:30 p.m. to 8:30 p.m. by order of a judge does not have the potential for discrimination.

The order of the Guilford County Superior Court extending the polling hours did not violate § 5 of the Voting Rights Act.

### IV.

▮▮ Plaintiffs' claim under 42 U.S.C. § 1983 is based on allegations that various legal irregularities that affected the voting process in Durham and Guilford Counties constituted state action that deprived them of constitutional rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Seemingly, they identify as unconstitutional state action both the original mechanical malfunctionings of the voting machines and then the state court orders which in both counties extended the voting periods in efforts to rectify the effects of the malfunctioning.

Specifically, Plaintiffs' claim is that the effects of the legal irregularities growing out of the original mechanical malfunctionings (which are nowhere alleged to have been purposefully caused) violated the undeniable federal constitutional "right of all qualified citizens to vote ... and to have their votes counted ..."; a right that "can neither be denied outright ... nor de-

stroyed by alteration of ballots ... nor diluted...." *Reynolds v. Sims*, 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964) (citations omitted). They claim that what happened in the two counties had the effect of an outright denial of the right to vote of some would-be voters (those deterred by the malfunctioning machines) and of diluting that of others who did vote (by illegally allowing some to vote after legal hours who would not otherwise have voted). The effect of these in combination, they allege, was significant enough probably to affect the election result, thereby entitling them to a decree invalidating the voting in the two counties.

To support their claim that such a denial and dilution did actually occur, they rely on the official records of the two County Boards of Election and the State Board of Elections. These, they contend, preclusively show that the effects did occur and that they resulted from violations of state election laws. And they further rely on the orders of the two state judges which, they contend, found that unconstitutional denials of the right to vote had occurred that required extensions of the voting periods.

Plaintiffs and Defendants have filed cross-motions for summary judgment on this § 1983 claim. We agree with Defendants that the claim must be dismissed.

The basis is a simple one that does not require extensive discussion: Plaintiffs' claim is not one cognizable under 42 U.S.C. § 1983. As alleged in their complaint and supported by the other materials filed and relied upon, it fails to demonstrate violation of the general federal constitutional right invoked.

■ While the right of all qualified voters to vote and to have their votes counted and not diluted in state elections is ultimately insured by the Constitution of the United States, specifically the Equal Protection Clause, *see Reynolds*, 377 U.S. at 544, 84 S.Ct. at 1372, the federal right thereby secured is not an absolute one. The same constitution which creates it as an ultimate safeguard against state action imposes structural limitations upon it by delegating to the states the primary power

and responsibility to conduct, and to police, their own elections. U.S. Const. art. I, § 4, cl. 1; *Oregon v. Mitchell*, 400 U.S. 112, 124–29, 91 S.Ct. 260, 264–67, 27 L.Ed.2d 272 (1970); *Hutchinson v. Miller*, 797 F.2d 1279, 1282–85 (4th Cir.1986); *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir.1980). North Carolina, like all states, has accepted and acted upon the power thus conferred by enacting a detailed set of laws governing the state's electoral process and providing for administrative and judicial supervision to correct irregularities occurring in the process. N.C.Gen.Stat. §§ 163–1 *et seq.*

Responding to this structural limitation—whose exact dimensions are not spelled out in the Constitution—the courts uniformly have recognized that whether particular state action impinges upon the ultimate federal right of suffrage is in all cases a matter of degree. Here, as in other contexts, *see Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), whether particular conduct amounts to a constitutional deprivation remediable under 42 U.S.C. § 1983, or a lesser legal wrong remediable only under state law, depends on the nature of the alleged wrong. The determinants are whether the harm sustained

> was inflicted intentionally or accidentally, whether it is [a] part of [a] pattern that erodes the democratic process or ... is more akin to a negligent failure ... to carry out the state ordained electoral process and whether state officials have succumbed to "temptations to control ... elections by violence and by corruption."

*Gamza*, 619 F.2d at 453 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 666, 4 S.Ct. 152, 159, 28 L.Ed. 274 (1884)).

■ Such a constitutional injury might theoretically be found in the aberrant conduct of particular elections as well as in general laws and executive orders impinging on the right of suffrage, but only in extreme cases of intentional state action literally corrupting the process. *See, e.g., Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973) (placing sham candidate's name on ballot). In such a case, a cognizable § 1983

claim might therefore be recognized, and a remedial decree affecting a completed election found warranted. *See id.* at 1102. It is not, therefore, proper to say that a § 1983 claim can never be grounded in irregularities in completed elections.

Ordinarily, however, state action amounting to a constitutional deprivation cognizable under § 1983 is only found in general state laws inflicting harms that are remediable by prospective decrees that do not intrude on the state's conduct and corrective supervision of completed elections. *See, e.g., Reynolds,* 377 U.S. 533, 84 S.Ct. 1362 (challenge to legislative reapportionment violative of one-person-one-vote principle); *Cromer v. State of South Carolina,* 917 F.2d 819 (4th Cir.1990) (challenge to legislatively imposed filing deadline for independent candidacies). In recognition of this constitutionally grounded structural limitation on the federal right, the Fourth Circuit, along with federal courts in general, has been reluctant to entertain § 1983 claims for relief with respect to completed elections. *See Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir.1983) (although general state law found violative of federal right, remedy confined to prospective injunctive decree in deference to state's primary authority to remedy particular election results); *Hutchinson,* 797 F.2d at 1287–88 (court declines to entertain § 1983 claim for monetary relief by losers in an election who alleged flagrant election law violations that caused their loss).

We are satisfied that, under the precedents, the injury alleged here—assuming that injury in fact resulted from the irregularities alleged—falls in the category of a "lesser legal wrong" rather than of a violation of the federal constitutional right. Assuming that every irregularity claimed did occur as alleged (without regard to whether it was specifically found by either the state administrative agencies or the two state judges), none is claimed or could be claimed to have resulted from intentional, systematic conduct aimed at corrupting the state's electoral process. The original malfunctioning was purely fortuitous. The efforts by the two judges to rectify the situa-

tion were, even if somehow legally erroneous, no more than that. They were not intended to pervert the process, but to salvage it. At least there is no claim of other purpose. Such irregularities are the classic concern of the states under the constitutional framework. Federal intervention to attempt to rectify any injury done here would require the undoing of a completed election, a remedy properly reserved to the State of North Carolina and available under its election laws.

 Plaintiffs attempt to elevate the irregularities they allege to the level of constitutional violation by pointing out that they were not merely "garden variety," but involved plain violations of plain state law—particularly the court-ordered extensions of voting hours. Laying aside the point that "irregularity" in this context inevitably implies "illegality," it is settled that a § 1983 action does not lie to force a state to comply with its own laws. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Under the constitutional allocation of powers for enforcing the federal right of suffrage, that power here lay exclusively with the courts and administrative agencies of North Carolina, and not with the federal courts.

## V.

In Plaintiffs' final claim for relief, they seek to invoke this court's supplemental jurisdiction, asking that we review the State Board of Elections' decision in lieu of the review provided in the Superior Court of Wake County under North Carolina General Statute § 163–181. Since the dismissal of Plaintiffs' claims under the Voting Rights Act and § 1983 will leave no other federal claim before the court, Plaintiffs' state law claims will also be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Brandenburg v. Seidel,* 859 F.2d 1179, 1190 (4th Cir.1988). *See* 28 U.S.C. § 1367(c)(3). Such dismissal does not foreclose Plaintiffs' pursuit of any rem-

edies that may still be available to them under state law.