Louis TERRAZAS, et al., Plaintiffs,

v.

Bob SLAGLE, et al., Defendants.

Civ. A. Nos. A–91–CA–425, A–91–CA–426, A–91–CA–428.

United States District Court,
W.D. Texas,
Austin Division.

Aug. 21, 1992.

John N. McCamish, Jr., Kevin M. Warburton, McCamish, Martin & Loeffler, Jonathan D. Pauerstein, McCamish, Ingram, Martin & Brown, San Antonio, TX, for plaintiffs.

David Sibley, pro se.

James P. Allison, Bob Bass, C. Rex Hall, Jr., Allison & Associates, Renea Hicks, Javier Guajardo, Office of the Atty. Gen., Austin, TX, for defendants.

Before GARWOOD, Circuit Judge, and HUDSPETH and WALTER S. SMITH, Jr., District Judges.

## ORDER AND REASONS

PER CURIAM:

Before the Court is the motion of plaintiffs, Louis Terrazas, *et al.,* filed August 7, 1992, to enforce the prior orders of this Court filed herein December 24, 1991 and January 10, 1992, as amended January 13, 1992, respecting the Texas Senate redistricting plan to be implemented for the 1992 elections, and to require defendant John Hannah, Jr. (Hannah), the Secretary of State of Texas, to rescind the directions and instructions that he issued August 6, 1992, regarding the 1992 Texas Senate elections, and to prevent defendants Bob Slagle (Slagle), Chairman of the Democratic Party of Texas, and Fred Meyer (Meyer), Chairman of the Republican Party of Texas, and all acting in concert with them, from complying with or carrying out Hannah's said directions and instructions. Also before the Court are similar motions filed by plaintiff-intervenor David Sibley and by plaintiff-intervenor Bill Sims. Responses to plaintiffs' said motion have been filed by Slagle and, jointly, by Hannah and defendants the Governor and Attorney General of Texas (herein collectively the "state" or "state defendants"). The United State Department of Justice has, with leave of Court, appeared and filed an *amicus* brief. After due notice, this Court held a hearing and

received evidence and argument on said motions on August 17, 1992, and, having taken the matter under advisement, now issues this its order and judgment herein.

This Court's December 24 order was issued in this cause and in consolidated causes numbers A–91–CA–425, regarding the Texas House of Representatives redistricting, and A–91–CA–428, regarding redistricting of Texas Congressional Districts, and followed an approximately four-day hearing that began December 10, 1991. This Court denied interim relief in No. 428. As to the Texas House and Senate, this Court had before it and considered, as to each body, redistricting plans passed in 1991 at the regular session of the 72nd Texas Legislature (H.B. 150 for the House; S.B. 31 for the Senate) that had not been precleared under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, plans submitted by the plaintiffs, and plans that had been ordered pursuant to settlements in state court suits (*Mena v. Richards; Quiroz v. Richards*) in Hidalgo County, Texas, and that, as to the Senate ("*Quiroz*" plan), had been precleared by the United States Department of Justice in November 1991 but had been invalidated on procedural grounds by the Texas Supreme Court on December 17, 1991. *Terrazas v. Ramirez*, 829 S.W.2d 712 (Tex.1991). The Court's December 24 order recites "[b]efore the Court is plaintiffs' motion for implementation of interim plan filed in cause No. A–91–CA–425 on November 14, 1991; plaintiffs' request for implementation of interim plan filed in cause number A–91–CA–426 on November 27, 1991; ...." This Court ordered into effect its own "interim state legislative redistricting plan" for the House and Senate each "to provide for the holding of elections in Texas without delay and in accordance with existing state law," and decreed, among other things, as follows:

"... it is the Judgment of this Court that the 1992 primary elections proceed as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–428 is DENIED, and that elections should proceed on an interim basis under the congressional plan as drawn in ... [the 1991 state legislation fixing congressional district];

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–426 is GRANTED, and that primary elections for the Texas Senate will be conducted under this Court's interim plan attached as Appendix A to this Judgment;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiffs' request for interim relief filed in cause number A–91–CA–425 is GRANTED, and that primary elections for the Texas House of Representatives be conducted under this Court's interim plan attached as Appendix B to this Judgment;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the candidate filing deadlines for the 1992 primary elections are extended to January 10, 1992.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the residency requirement for candidates to the Texas Senate, and Texas House of Representatives are hereby waived for elections held under the State House and State Senate interim plans in 1992."

The 72nd Texas Legislature convened its third called session on January 2, 1992, and adjourned on January 8, 1992. During this session the legislature passed a bill (H.B. 1) redistricting the Texas House "beginning with the election of the 74th legislature" (the 1994 elections), but no legislation was enacted respecting House redistricting for the 1992 elections. Also passed was a bill (H.B. 2) rescheduling all the primary elections for April 11, 1992.[1] As this bill did not receive a

---

1. H.B. 2 also included the following provision:
"**SECTION 8. NOMINATION BY EXECUTIVE COMMITTEE.** (a) If a redistricting plan for either house of the legislature is to be effective for the 1992 general election for state and county officers and that plan is different

from the plan used in the 1992 primary elections, and if a political party has no nominee for a particular office under the new plan, the political party's appropriate executive committee may nominate a candidate to appear on the general election ballot for that office. This

two-thirds vote, it could not be effective, under Tex.Const. art. III § 39, until ninety days after adjournment, or April 8, 1992. Finally, the legislature passed on January 8 a bill (S.B. 1) redistricting the Texas Senate, stating that it "takes effect beginning with the election of the 73rd Legislature," *i.e.,* beginning with the 1992 elections. However, this bill did not receive a two-thirds vote, and hence it, too, was not effective until April 8, 1992. The senatorial districts provided for in S.B. 1 are the same as those in the *Quiroz* plan.

On January 9, 1992, the state defendants filed a motion to modify or vacate this Court's December 24, 1991 order in respect to the House and Senate. The state's said motion (as well as its motion to modify or stay filed December 31, 1991) was denied in our January 10, 1992 order. A principal contention of the state was that the S.B. 1 plan should be used for the Senate, that it had been in effect precleared because it was identical to the *Quiroz* Senate plan that had been precleared in November 1991, and that even if further preclearance were required that could likely be achieved in time for the primaries to take effect for the April 11, 1992 primary date specified in H.B. 2. The state defendants also requested that the House districts specified in H.B. 1 (which were the same as those of the *Mena* settlement) be used for the 1992 elections.

In denying relief, this Court's January 10 order states in part:

"In the present case, this Court's December 24, 1991 judgment does no more than provide for the holding of 1992 elections as scheduled under Court-ordered interim plans that temporarily address voting rights deficiencies in the plans passed by the Texas Legislature. In denying the stay, this Court in no way intends to limit the efforts of the Legislature in adopting acceptable permanent plans at any time it sees fit. Early in the second called Ses-

sion, the Texas House approved this Court's interim plan redistricting that body for the 1992 primary elections, and fashioned a substitute permanent plan to be implemented for the 1994 elections. The Texas House indicated it approved the Court plan in order to guarantee that the elections go forward as presently scheduled."

The January 10 order also states:

"... this substitute plan ("S.B. 1") adopted by the Legislature is identical to the one submitted by the parties in the *Quiroz* case in Hidalgo County. That "*Quiroz* plan" was before this Court during the period in which it reviewed SB 31, found that law in violation of the Voting Rights Act, and drafted its interim plan. Had this Court believed that the "*Quiroz* plan" better addressed the interests of minority voters its plan would have more closely mirrored the Senate districts drawn by the parties in *Quiroz*.

A detailed comparison of the Court's interim plan with the "*Quiroz* plan" reveals that the Court's plan, and not *Quiroz*, provides a greater opportunity for all minority citizens of the State of Texas to elect representatives of their choosing.

. . . .

Until formal comment on the substitute Senate plan ("*Quiroz* plan") has been made by the Department of Justice, elections cannot proceed under the Legislature's proposed plan [S.B. 1] as scheduled under current state law. Alternatively, should the opinion of the Department of Justice issue in the next few days, this Court has already reviewed testimony and other evidence on the Senate's substitute plan during the December hearings and finds it fails to satisfy the Sec. 2 requirements of the Voting Rights Act."

The January 10 order concluded by stating:

The United States Department of Justice on March 10, 1992, denied the state's request for preclearance of this provision under section 5 of the Voting Rights Act.

subsection does not apply to an office the district of which includes the same territory under the new plan as it did under the plan used in the 1992 primaries.

(b) The secretary of state shall prescribe the procedures necessary to implement this section."

"ACCORDINGLY IT IS ORDERED, ADJUDGED AND DECREED that the State Defendants' Motion for Stay is in all things DENIED, and that the 1992 primary elections proceed as presently scheduled under state law, with an election date of March 10, 1992;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that primary elections for the Texas Senate and Texas House of Representatives be conducted under this Court's interim plans attached as Appendices A and B to this Court's Judgment entered December 24, 1991;

IT IS FURTHER ORDERED that the candidate filing deadlines for the 1992 primary elections to all offices remains January 10, 1992."

The primary elections for the Texas Senate and House (as well as other offices) were held March 10, 1992, according to this Court's aforesaid order and in the districts established thereby, as were also the subsequent run-off primaries in April 1992. The nominees of the parties for the 1992 general election for the Senate (and other offices) were thus selected.

The state defendants appealed this Court's December 24, 1991 and January 10, 1992 orders to the United States Supreme Court, and also made requests to that Court for a stay of those orders. All the requests for stay were denied. *See Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 924, 116 L.Ed.2d 924 (1992); *Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 1073, 117 L.Ed.2d 278 (1992). *See also Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 1157, 117 L.Ed.2d 405 (1992) (denying motion of appellants to expedite); *Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 2272, 119 L.Ed.2d 199 (1992) (denying motion of

plaintiffs in *Mena* state suit to intervene). On June 29, 1992, the Supreme Court in the state's appeal entered its order stating that "The judgment is affirmed." *Richards v. Terrazas*, —— U.S. ——, 112 S.Ct. 3019, 120 L.Ed.2d 891.[2] That is clearly a judgment on the merits.

On July 27, 1992, the United States District Court for the District of Columbia issued its opinion and order in its cause No. 91–2383, *State of Texas v. United States*, 802 F.Supp. 481, which was a suit brought by the state pursuant to section 5 of the Voting Rights Act to preclear legislative redistricting plans, in which the state sought, *inter alia*, to preclear that of S.B. 1. The plaintiffs in the present case (*Terrazas, et al.*) were permitted to intervene. The state filed a motion for summary judgment supported by affidavits; the motion was opposed only by the parties Terrazas, and they did so solely on the basis that the statement in this Court's January 10 order that S.B. 1 violated section 2 of the Voting Rights Act (42 U.S.C. § 1973) collaterally estopped the state from contending otherwise. The District of Columbia Court rejected the collateral estoppel argument, on the basis that the statement relied on was not necessary to this Court's decision, and, on the basis of the state's unrebutted affidavits, concluded that the districts as provided for in S.B. 1 were more favorable to minority voters than those provided for in this Court's plan. The court thus rendered judgment granting preclearance to the S.B. 1 redistricting plan under section 5 of the Voting Rights Act.[3]

On August 6, 1992, defendant Hannah promulgated the directive at issue here.[4] In essence it directs that:

---

2. We are informed that defendant Slagle also took a separate appeal, which apparently has been docketed in the Supreme Court as *Slagle v. Terrazas*, No. 91–1546, and that the Supreme Court has taken no action on the jurisdictional statement therein. On February 19, 1992, the Supreme Court denied Slagle's request for stay pending appeal. *Slagle v. Terrazas*, —— U.S. ——, 112 S.Ct. 1075, 117 L.Ed.2d 278.

3. We are not informed as to whether or not that judgment has become final and appealable or, if so, whether it has been appealed.

4. It is entitled "Directive," dated August 6, 1992, from Hannah, as Texas Secretary of State, and is addressed "To: County Clerks, Voter Registers, Election Administrators, Party Officials." Its text states:

"This Directive is issued pursuant to my authority as Chief Election Officer of the State of Texas and under Sections 31.001, 31.003, 31.004, and 31.005 of the Texas Election Code. All matters in this Directive pertain to the 1992 General Election for State and County Officers. 1. The election for the Texas Senate on November 3, 1992, shall be held pursuant to

(1) the 1992 general elections for the Texas Senate shall be held in the districts established by S.B. 1, rather than in those established by this Court's prior orders in which the primaries (and run-off primaries) were held and the nominees chosen;

(2) the nominees for the 1992 general election to be conducted in each given numbered senatorial district established by S.B. 1 will be the nominees selected at the primaries for the "same numbered" senate district under this Court's plan;

(3) however, on the request of such a nominee who does not live in the S.B. 1 district for which he was "nominated" as aforesaid, the state party chair may declare the nominee ineligible, in which event the party executive committee may designate the nominee for such S.B. 1 district.[5]

There has been no preclearance of the August 6 directive or the procedures mandated or authorized thereby. However, it appears that on August 14 the state forwarded a section 5 preclearance request in this respect to the Department of Justice, although maintaining that such was not necessary.

To place the August 6 directive in context, it is necessary to understand that the same numbered senate districts in this Court's plan under which the primaries were conducted and those in S.B. 1 are each different geographical regions with different populations. *None* of the thirty-one same numbered district are the same. While there is relatively close correspondence in a few districts,[6] in others there is wide—in one case total—disparity. Thus, S.B. 1 senate district 24 is comprised entirely of counties none of which were included (in whole or in part) in court plan district 24, and the populations and territories of the two districts are 100% distinct; the *only* commonality between the two is that each is described by the same number "24." District 24 under the court plan was a minority district; S.B. 1 district 24 is not a minority district. Similarly, in S.B. 1 district 6, only 3.4% of the population lives in any of the area included within court plan district 6. In S.B. 1 district 26, only 2.1% of the population lives in any of the area included within court plan district 26. In S.B. 1 district 15, only 14% of the population lives in any of the area included within court plan district 15. In some eleven of the thirty-one S.B. 1 districts less than half of the population consists of persons living in any of the area included within the same numbered court plan district.[7]

The parties focus on two principal contentions:

Any questions concerning lines or maps of S.B. 1 should be directed the Texas Legislative Council at (512) 463–1143. Any questions concerning any other matter relating to the election of the Texas Senate should be directed to John Tunnell, General Counsel to the Secretary of State, at (512) 463–5701."

---

Senate Bill 1, 72nd Legislature, 3rd Called Session, 1992 (hereinafter referred to as "S.B. 1").

2. The candidates who received the nominations of their respective parties for Texas Senate in the 1992 primary elections will be the nominees for the same numbered Senate Districts in November, 1992, under S.B. 1.

3. Upon the request of a nominee for the Texas Senate who does not reside in the Senate District, under S.B. 1, for which he or she was nominated in the primary elections, the appropriate State Chair shall administratively declare the nominee ineligible under Section 145.003 of the Texas Election Code by the deadline of August 31, 1992.

4. In the event a nominee is administratively declared ineligible under Section 145.003 of the Texas Election Code, the appropriate party executive committee may name a replacement nominee under Sections 145.036 and 145.037 of the Texas Election Code not later than September 4, 1992. A replacement nominee must meet the qualifications of Article III, Section 6 of the Texas Constitution and may include a previous nominee who was administratively declared ineligible under Item 3 above.

5. Such replacement nominee must meet residence requirements in the S.B. 1 district for which so nominated, but may be one who was nominated in the primary for a district with a different number under this Court's plan and who, at his request, was declared ineligible for such district by the party chair under the above provisions.

6. In 4 of the S.B. 1 districts the percentage of the population that was included in the same numbered court district is at or above 95% (the highest being 98.4%). In all the other S.B. 1 districts the percentage is less than 95%.

7. In approximately 17 of the S.B. 1 districts less than 75% of the population consists of persons living in any of the area included within the same numbered court plan district.

First, movants contend that the August 6 directive may not be implemented because it has not been precleared under section 5. The Justice Department agrees with this position. The state and Slagle contend that S.B. 1 having been precleared, no further preclearance is necessary.

Second, movants contend that the August 6 directive conflicts with this Court's December 24 and January 10 orders because those orders require use of the court plan senate districts for the 1992 elections. The state and Slagle contend that this Court's said orders pertain only to the 1992 primary elections and may not be construed to extend to the 1992 general elections.

We agree with movants, and disagree with the state and Slagle, on both grounds. And we grant relief accordingly.

Turning first to the matter of preclearance, this is required by section 5 of the Voting Rights Act respecting any change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. In *NAACP v. Hampton County Election Commission*, 470 U.S. 166, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985), the Supreme Court stated that "Congress specifically endorsed a broad construction" of this provision, *id.* 470 U.S. at 176, 105 S.Ct. at 1134, that the Court had applied it to, among other things, changes in candidate residence requirements, alteration of municipal boundaries, and the location of polling places, *id.* 470 U.S. at 177 n. 22, 105 S.Ct. at 1135 n. 22, and that "the construction placed upon the Act by the Attorney General ... is entitled to considerable deference." *Id.* 470 U.S. at 178, 105 S.Ct. at 1135. The Court then went on to say:

"Under Department of Justice regulations:

'Any change affecting voting, even though it appears to be minor or indirect, even though it ostensibly expands voting rights, or even though it is designed to remove the elements that caused objection by the Attorney General to a prior submit-

ted change, must meet the Section 5 preclearance requirement.' 28 CFR § 51.11 (1984).

Among the specific examples of changes listed in the regulations is '[a]ny change affecting the eligibility of persons to become or remain candidates.' § 51.12." *Id.* 470 U.S. at 179, 105 S.Ct. at 1135–36.

Texas law and practice has consistently been that at the general election for state offices the nominees of the respective political parties are those nominated at the preceding party primary elections. Texas Election Code §§ 161.008, 172.001. Primary elections for offices chosen by the electorate in separate geographical districts obviously make no sense unless the districts are the same for the ensuing general election as for the primary, and we must presume that this is the intendment of the Texas law. We agree with the Justice Department's undisputed assertion that "To our knowledge, the State of Texas has never held or sought to hold a general election under a redistricting plan different from the plan used for the preceding primary election." Because the Secretary of State's August 6 directive makes this vast departure from settled Texas law and practice, it is clearly a change for purposes of section 5.

The August 6 directive makes other changes within section 5. Thus, the directive authorizes persons to be general election candidates, and to be elected, in an S.B. 1 district even though they do not meet the Texas Const. art. III § 6 residency requirements for that district, so long as they won the primary in the same numbered court plan district, a district that may be totally or substantially different (and certainly will be somewhat different).[8]

■ The state argues that the August 6 directive merely implements S.B. 1, which has been precleared. We reject this contention, just as the Supreme Court rejected a parallel contention in *Hampton County Election Commission*, 470 U.S. at 179–81, 105

---

8. This Court's December 24 order did waive the residency requirement "for elections held under the State House and State Senate interim plans in 1992," but this reference to "interim plans" was clearly to the Court's plans, as is made clear from the fact that in the two paragraphs immediately preceding the paragraph just before that dealing with residency the Court's plans are each described as "this Court's interim plan."

**1160**

S.Ct. at 1136–37. We note that nothing in S.B. 1 purports to authorize the choosing of party nominees by primaries in districts different from those to be used in the general election. Indeed, S.B. 1 plainly contemplates that the same districts will be used for the general elections as for the primaries. Nor does it speak to residency requirements. Further, nothing in the opinion or judgment of the District of Columbia District Court speaks to any of these matters.

The state also contends that because the August 6 directive is within the powers conferred on the Secretary of State by divers provisions of the Texas Election Code, which have themselves been precleared, further preclearance is not required.[9] The provisions relied on by the state are of the most general character, and none come close to addressing the subject matter of general election nominees for particular districts being chosen on the basis of primary elections in other districts, or to waiver of residency requirements.[10] We reject this contention for essentially the same reasons as were

stated by the court in *United States v. State of Texas,* Civil Action No. SA–85–CA–2119 (W.D.Tex. Aug. 1, 1985) (three-judge court), *aff'd* 474 U.S. 1078, 106 S.Ct. 844, 88 L.Ed.2d 886 (1986), *viz:*

"Nor do we agree with the State's contention that preclearance of the election code carried with it approval by the Attorney General of whatever emergency election schemes were subsequently ordered by the State election official. The construction of the Attorney General's prior action is made clear by his appearance in this case as well as by Department of Justice regulations:

'Enabling legislation and contingent or nonuniform requirements.

(a) The failure of the Attorney General to interpose an objection to legislation: (1) That enables or permits political subunits to institute a voting change or (2) that requires or enables political subunits to institute a voting change upon some future event or if they satisfy certain criteria does not exempt the politi-

---

**9.** Movants dispute that the Secretary of State has this power under state law, a proposition with which we are inclined to agree but need not reach. We agree with movants' further contention that even if the Secretary of State does have such general power, his exercise of it in a particular case must nevertheless be precleared.

**10.** The state relies on Tex.Elec.Code §§ 31.001, 31.003, 31.004, and 31.005. These sections provide:

"§ 31.001. **Chief Election Officer**
(a) The secretary of state is the chief election officer of the state.
(b) The secretary of state shall establish in his office an elections division with an adequate staff to enable him to perform his duties as chief election officer. The secretary may assign to the elections division staff any function relating to the administration of elections that is under his jurisdiction."
"§ 31.003. **Uniformity**
The secretary of state shall obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code. In performing this duty, the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code. The secretary shall distribute these materials to the appropriate state and local authorities having duties in the administration of these laws."
"§ 31.004. **Assistance and Advice**

(a) The secretary of state shall assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code.
(b) The secretary shall maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties."
"§ 31.005. **Protection of Voting Rights**
(a) The secretary of state may take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes.
(b) If the secretary of state determines that a person performing official functions in the administration of any part of the electoral processes is exercising the powers vested in that person in a manner that impedes the free exercise of a citizen's voting rights, the secretary may order the person to correct the offending conduct. If the person fails to comply, the secretary may seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general."
While the state also points to Tex.Elec.Code §§ 145.003, 145.035, 145.036, and 145.037, which are more specific, none of these provisions speak to or purport to authorize the changes mentioned in the text.

cal subunit itself from the requirement to obtain preclearance when it seeks or is required to institute the change in question, unless implementation by the subunit is explicitly included and described in the submission of such parent legislation.'

29 C.F.R. § 51.14(a) (1984)." [11]

Were this not the law, municipal annexations and deannexations—which must be precleared, 28 C.F.R. § 51.13(e) (1991); *Hampton County Election Commission,* 470 U.S. at 177 n. 22, 105 S.Ct. at 1134 n. 22—would rarely have to be precleared because most are conducted pursuant to pre-Voting Rights Act coverage, or previously precleared, general grants of authority by legislation or constitutional provision.

Accordingly, we hold that the August 6 directive must be, but has not been, precleared under section 5 of the Voting Rights Act, and may not be implemented.

■ We now turn to the question of the meaning, and hence the effect, of this Court's December 24 and January 10 orders with respect to whether the Court's interim plans therein promulgated apply to the 1992 elections generally or only to the 1992 primaries. If, as movants contend, they apply to the 1992 elections generally, then Hannah's August 6 directive is clearly in violation thereof. The state and Slagle, pointing to the frequent use in the orders of the word "primary," as well as the reference to the "interim" nature of the plans, contend that they apply only to the primaries. We disagree. Although there is a certain surface, technical plausibility in defendants' argument in this respect, we conclude that when read as a whole and in context it is clear beyond reasonable dispute that the orders contemplate and require use of the court-ordered plans throughout the 1992 elections.

In common and universal usage the words "primary elections," with respect to offices filled by election from diverse geographically defined single member districts, mean elections in which will be chosen the party nominees for the next general election in the same district as that in which the primary election takes place. And this is clearly the accepted meaning of the term in the law and long settled practice of Texas. It cannot have reasonably been thought that our orders used the words in any other sense. Moreover, for a redistricting case, particularly one under the Voting Rights Act, to order a redistricting plan fixing the boundaries of the several single member districts for the primaries only, and not for the next general election at which the officials would actually be selected, would be the height of futility and purposelessness.

Other textual and contextual considerations point in the same direction. Our December 24 order expressly grants plaintiffs' motion for interim relief filed November 27 in cause No. 426, which motion clearly requests implementation "of an alternate redistricting plan for the 1992 election for the Texas Senate" and is obviously not limited to the 1992 primary, but seeks interim relief in the sense of relief only for the 1992 election. The December 24 order waives residency requirements "for elections held under the State House and State Senate [court ordered] interim plans in 1992," clearly indicating that the court ordered plans applied throughout the 1992 elections. They were "interim" only in the sense that they did not govern after the 1992 elections. And, the December 24 order characterized itself as providing for the holding of elections "in accordance with existing state law," which clearly contemplated that the same districts would be used for the general election as for the preceding primary.

Similarly, our January 10 order characterizes our December 24 order as providing "for the holding of 1992 elections as scheduled under Court-ordered interim plans." While we said we did not intend to limit the legislature in thereafter adopting "permanent plans," this clearly referred to plans for 1994 and subsequent elections, as our citation to the action of the Texas House in the 3rd called session plainly reflects (H.B. 1).[12] This likewise reflects our understanding—

---

**11.** This provision now appears at 28 C.F.R. § 51.15(a) (1991).

**12.** Obviously, it did not refer to S.B. 1, which we rejected.

and our understanding of the House's under-standing—that our orders governed the 1992 elections, general as well as primary.

Our prior orders directed the 1992 House and Senate elections—general as well as pri-mary—be held according to the districts specified in the orders. These orders have been affirmed on the merits by the United States Supreme Court. The August 6 di-rective is unlawful because it is in conflict with this Court's said previous orders.

IT IS ACCORDINGLY ORDERED, AD-JUDGED and DECREED:

1. That the August 6 directive may not be implemented because it has not received the preclearance required under section 5 of the Voting Rights Act and, in any event, because it conflicts with this Court's said orders of December 24 and January 10, which said orders apply to the 1992 Texas Senate (and House) elections, both general and primary;

2. That the state defendants, and Slagle and Meyer, and any and all persons acting in concert with any of them, are hereby en-joined from implementing or complying with said August 6 directive, and are ordered to set aside any action heretofore taken under or pursuant thereto; and,

3. That the state defendants, and Slagle and Meyer, are hereby ordered to carry out the 1992 Texas Senate general elections ac-cording to and utilizing the senate districts established in this Court's said December 24 and January 10 orders.

IT IS FURTHER ORDERED that the injunction provided for in paragraphs 2 and 3 above shall be effective upon the filing by plaintiffs of a bond in the amount of $500.00.